***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Therefore the Full Commission enters the following Opinion and Award:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties appearing in their respective capacities have been correctly designated.
4. This claim against the North Carolina National Guard, a department of the State of North Carolina, and this claim has been brought pursuant to the North Carolina Tort Claims Act.
5. This matter should be bifurcated and the issue of liability should be first determined by the Industrial Commission and the issues of damages will be resolved subsequent to the issue of liability.
6. The accident giving rise to the claims of the plaintiffs occurred at the beachfront in Caswell Beach, Brunswick County on September 22, 1999 at approximately 10:30 p.m.
7. That plaintiffs Jill Ward, Christy Snapp and Michael Gregory were injured as the result of a motor vehicle accident in which the motor vehicle was being operated by SPC Leon R. Penland, Jr. of the North Carolina National Guard.
8. On September 13, 1999, and still in effect on the date of the incident, the governor had declared a state of emergency pursuant to N.C. Gen. Stat. § 166A et. seq. as a result of Hurricane Floyd.
9. At the time of the accident, plaintiffs Jill Ward, Christy Snapp and Michael Gregory were passengers in the vehicle that was being operated by SPC Leon R. Penland, Jr.
10. Leon R. Penland, Jr. was killed as the result of injuries sustained in the accident which is the subject matter of this proceeding.
11. Leon R. Penland, Jr. was a member of the North Carolina National Guard, and had been ordered to active duty in the North Carolina National Guard prior to September 22, 1999.
12. In addition, the parties stipulated into evidence the following:
1. Line of duty report marked as Stipulated Exhibit 1.
2. Defendant's responses to plaintiffs' First Set of Interrogatories and Request to Produce, marked as Stipulated Exhibit 2.
3. Defendant's response to plaintiffs' request for admission, marked as Stipulated Exhibit 3.
4. Pictures of the Humvee and the accident scene marked as Stipulated Exhibits 4 through 10.
5. Request for estimated costs of damages marked as Stipulated Exhibit 11.
6. Operators Manual for the Humvee marked as Stipulated Exhibit 12.
7. Proclamation of State of Disaster marked as Stipulated Exhibit 13.
8. DUV 49, Field Notes and statements from the Highway Patrol marked as Stipulated Exhibit 14.
9. The Pre-Trial Order dated April 17, 2002 that was submitted by the parties to the deputy commissioner is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. In September 1999 Hurricane Floyd struck the North Carolina coast, causing destruction and extensive damage to many areas of eastern North Carolina, including the beaches and ocean front houses on Oak Island. Consequently, on September 14, 1999 former Governor Hunt issued a Proclamation of State of Disaster to implement the Emergency Operations Plan. Accordingly, the North Carolina National Guard was called to active duty and a unit was assigned to the Oak Island area. The purpose of the assignment was primarily to assist local law enforcement and emergency personnel in securing the beach area and the houses on the island.
2. Specialist Leon Reece Penland, Jr. of Hayesville, North Carolina volunteered for active duty and was assigned to work in the area. He was licensed to drive Humvees, which were military utility trucks designed for cross-country use. However, he had apparently never driven one on a sandy beach before the date in question.
3. On the evening of September 22, 1999, Specialist Penland was sent to the Yaupon Beach Fire Department for dinner with instructions to wait for Sergeant Millan. Volunteers at the fire department provided food for emergency workers involved in the hurricane relief effort. While eating supper there, Specialist Penland met plaintiffs Jill Ward, Christy Snapp and Michael Gregory. Ms. Ward was an off-duty emergency medical technician with the Town of Oak Island who was volunteering her services at the fire department. Ms. Snapp and her father, Mr. Gregory, were volunteer members of the Yaupon Beach Fire Department and they were also volunteering their services. During the period after the hurricane struck, all three had helped the recovery effort by providing food to emergency workers and helping with beach patrols. The beach was littered with debris from the damaged houses, including septic tanks which had washed out, and those on beach patrol would essentially keep people off of the beach, not only for the safety of the public but also to prevent looting.
4. The three plaintiffs befriended Specialist Penland that evening. During the conversation with him, they expressed boredom, since there was little activity that night and they were "not on any call", as well as an interest in riding in a Humvee. Ms. Snapp had never ridden in one before. As a result of the conversation, Specialist Penland offered to take them on patrol in a Humvee. The four of them rode in one of the National Guard Humvees, which Specialist Penland drove. With directions from the others he drove onto the beach and then turned east to head towards Fort Caswell. The beach was dark and there were washed out places as well as debris which he had to avoid. Ms. Ward, who was seated in the front passenger seat, helped him avoid debris by pointing it out as he drove. As they approached the end of the island, they came across some people who were watching for turtles and gave them instructions to leave the beach.
5. Specialist Penland drove slowly up the beach but, when he turned around at the Coast Guard Station, he gunned the engine and the vehicle did a little fish-tail before it straightened out heading in the opposite direction. Although Mr. Gregory advised him to follow his outbound tracks and drive on the hard-packed sand in order to increase his speed, Specialist Penland began to drive in the softer sand towards the dunes. He returned to the hard pan sand momentarily but then steered to the right towards the softer sand. During this time, he was accelerating to significantly higher speeds than he had originally driven. Ms. Snapp's seat came loose as the vehicle bounced over the uneven terrain and she told the driver ten to fifteen seconds before the wreck loudly and more than once to slow down so that she could fix her seat. However, the speed was maintained and the vehicle became airborne. It landed and then vaulted again. After the second landing, the tires veered in the sand causing the Humvee to flip over. Before the vehicle came to a halt, Specialist Penland had been killed after being thrown from the vehicle and all three of his passengers had been injured. Ms. Snapp, the only passenger to wear a seat belt, was not thrown from the vehicle and suffered relatively minor injuries.
6. Plaintiffs have alleged that Penland's three passengers were injured due to gross negligence on his part. It was clear from the evidence that he was joy-riding at the time of the accident and was exceeding a safe speed. None of the passengers saw the speedometer and, considering the darkness and the uneven terrain, they were not in a good position to estimate the speed of the vehicle. Both of the women thought that it was going extremely fast, and Ms. Ward estimated the speed at 50 to 55 miles per hour. But their testimony also implied that a vehicle could not have gone that fast considering the debris and washouts on the beach. Mr. Gregory indicated shortly after the accident that he did not believe that Penland was driving recklessly, they weren't going "extra fast" and that he thought the vehicle was going between 40 and 50 miles an hour, which he did not consider to be an excessive speed. However, at 40 miles per hour the vehicle would have been traveling over 58 feet per second.
7. The evidence did not show any malice, intentional wrongdoing or deliberate misconduct on Penland's part. All four of the people in the vehicle were there because it was fun to ride in a Humvee on the beach. Penland merely exceeded his skill level, demonstrated errors in judgment and lost control of the vehicle without intending to hurt anyone and without deliberately endangering their lives or his own. Although he breached his duty of care to his three passengers by driving too fast, his actions did not rise to the level required in order to constitute gross negligence.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following
 CONCLUSION OF LAW
1. The injuries plaintiffs Jill Ward, Christie Snapp and Michael Gregory sustained on September 22, 1999 were not the result of gross negligence on the part of Specialist Leon Reece Penland, Jr., who was an emergency management worker acting within the course of his employment with defendant on that date. Yancey v. Lea, 354 N.C. 48 (2001).
2. Even if Specialist Penland had been grossly negligent, defendant would not have been liable for damages for these claims. G.S. §166A-14(a) reads:
 All functions hereunder and all other activities relating to emergency management are hereby declared to be governmental functions. Neither the State nor any political subdivision thereof, nor, except in cases of willful misconduct, gross negligence or bad faith, any emergency management worker complying with or reasonably attempting to comply with this article shall be liable for the death of or injury to persons, or for damage to property as a result of any such activity.
If the legislature had intended for the State to be liable for gross negligence by an emergency worker, the phrase providing an exception for gross negligence would have been placed at the beginning of the sentence or after all three subjects had been named. Rather, it was placed immediately before the reference to emergency management worker, indicating that it applied only to that subject. Statutes in derogation of sovereign immunity must be strictly construed. Consequently, the State has reserved its sovereign immunity for emergency management operations and has simply provided that the emergency workers themselves are liable for gross negligence committed during emergency management operations. G.S. § 166A-14(a); Nello L. Teer Co. v. North Carolina State HighwayCommission, 265 N.C. 1 (1965).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 ORDER
1. These claims are hereby DENIED.
2. Each side shall pay its own costs.
This the 10th day of November 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN